## HENDERSON v. PLYMOUTH OIL CO. (FARQUHAR, Intervener).

Circuit Court of Appeals, Third Circuit.
March 7, 1927.

Rehearing Denied May 31, 1927.

No. 3530.

1. **Courts** ⬅314—Federal court has jurisdiction of suit to compel stock transfer by foreign corporation, though real controversy is between stockholders, citizens of same state.

Federal court *held* to have jurisdiction of suit by resident of Pennsylvania against foreign corporation to compel transfer on its books of certain certificates of stock, though real issue in dispute was between plaintiff and intervener, who was resident of the same state, since the nonresident corporation, while a mere stockholder, was necessary party to release stock.

2. **Corporations** ⬅125—Person holding certificates of stock under assignment acknowledging value received with power of attorney has legal title.

Person having possession of certificate of stock under assignment acknowledging value received, with irrevocable power of attorney, has legal title thereto, placing burden on original owner to defeat such legal title.

3. **Corporations** ⬅30(2)—Promoter's transfer of stock to purchasers in partial reparation for fraud in misrepresenting outstanding stock held supported by sufficient moral consideration.

Transfer of stock by promoter to purchasers in partial reparation of fraud in misrepresenting amount of outstanding stock at time of sale, and in an endeavor to recompense purchasers, *held* supported by sufficient moral consideration.

4. **Corporations** ⬅80(11)—Evidence held to show fraudulent misrepresentations by promoter to purchasers as to outstanding stock of corporation.

Evidence *held* to establish that promoter, at time of making sale of stock, fraudulently misrepresented to purchasers the amount of outstanding stock of the corporation.

5. **Corporations** ⬅30(2)—Promoter's assignment of stock to purchasers in partial reparation for fraud in misrepresenting outstanding stock held not procured by duress.

Promoter, having assigned certain shares of stock to purchasers in partial reparation for fraud in misrepresenting amount of outstanding stock, *held* to have failed to establish that assignment thereof was procured by duress, or to have shown any proof for compelling the holders of such certificates to return them.

Woolley, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Western District of Pennsylvania; W. H. Seward Thomson, Judge.

Suit by William M. Henderson against the Plymouth Oil Company, wherein Jerome

19 F.(2d)—7

Q. Farquhar intervenes. From a decree for intervener (13 F.[2d] 932), plaintiff appeals. Decree vacated, and cause remanded, with directions.

Thorp, Bostwick, Stewart & Reed, of Pittsburgh, Pa., and Owen J. Roberts, of Philadelphia, Pa., for appellant.

George E. Alter, of Pittsburgh, Pa., for appellee Plymouth Oil Co.

Weller, Wicks & Wallace, of Pittsburgh, Pa. (H. D. Rummel, of Charleston, W. Va., and John W. Davis and James M. Nicely, both of New York City, of counsel), for appellee Farquhar.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. On October 20, 1924, the Plymouth Oil Company, a corporation, issued to J. G. Farquhar its 19 certificates of stock, Nos. 427–446, aggregating 50,000 shares of its common stock. Such certificates provided they were "transferable * * * on the books of the company * * * by attorney upon surrender of this certificate properly indorsed." Farquhar on June 26, 1925, using the transfers printed on the back of such 19 certificates, transferred such stock in blank by his 19 signatures, each duly witnessed, in form following: "For value received ——— do hereby sell, assign, and transfer unto ——— ——— shares of the capital stock represented by the within certificate, and do hereby irrevocably constitute and appoint ——— attorney to transfer the said stock on the books of the within named company, with full power of substitution in the premises. Dated June 26, 1925. J. G. Farquhar. In presence of W. G. Wilson." On the succeeding day, June 26, 1925, the subscribing witness, Wilson, united with W. M. Henderson, A. R. Budd, and F. B. Lockhart in a declaration of trust as follows:

"Whereas, the persons listed on the attached sheet are the holders of and have purchased the number of shares of stock set opposite their names in the Plymouth Oil Company upon the representation made by J. G. Farquhar et al. that the total outstanding capital stock of the company was 350,000 shares; and whereas, it is now contended that the total outstanding capital stock of the company is 1,050,000 shares; this memo witnesseth, that said J. G. Farquhar has this day turned over to Walter J. Wilson the following certificates of common stock of said company: [Reciting certificates above specified.]

"The said stock is now turned over to W. M. Henderson, and he hereby receipts for the same, to be held by him for the benefit proportionately of such of the stockholders mentioned on the attached list as shall elect to acquiesce in the action of the undersigned in demanding and receiving this stock, it being the intention of said J. G. Farquhar to add to this stock enough shares that the holdings of the persons on the attached lists shall be brought to a place where they will bear the same ratio to an outstanding issue of 1,050,000 shares as they would have borne, had the capitalization been as represented by said J. G. Farquhar, namely, 350,000 shares.

"Whereas, W. M. Henderson, F. B. Lockhart, Walter J. Wilson, and A. R. Budd have voluntarily constituted themselves a committee to obtain restitution for said misrepresentation, without any liability on their parts, and without binding or assuming to bind any of the other persons on the attached list, unless they shall elect to ratify this action.

"In witness whereof, we have hereunto set our hands and seals this 26th day of June, 1925."

On December 9, 1925, Henderson, who was a citizen of Pennsylvania, filed in the court below a bill in equity against the Plymouth Oil Company, a corporate citizen of Delaware, whose office and officers for the transfer of stock were in Pittsburgh, Pa., which, so far as here pertinent, set forth that Farquhar had, on or before June 26, 1925, for value, transferred and assigned said stock to Henderson; that from that time until December 9, 1925, the transfer of all stock by the said company had been enjoined in a suit against the company in Delaware; that such injunction was dissolved on December 9, 1925; that on request the company had declined to transfer; that the amount in controversy exceeded $3,000, and prayed it be ordered to transfer the 50,000 shares aforesaid and pay the dividends thereon accrued. To this bill Plymouth made answer, stating, so far as is here pertinent, that the stock and dividends were claimed by Farquhar, who had notified it not to transfer the same or pay the dividends thereon; that it was a mere stakeholder, and "stands ready to register said stock in the name of the person or persons lawfully entitled thereto"; and prayed that Farquhar be decreed to interplead.

Thereafter Farquhar prayed and was allowed to intervene, and answered, and denied "that he transferred said stock to said Henderson for value, and avers that Henderson procured possession of the certificates above referred to by duress and fraud," and prayed that Henderson be decreed to deliver the 19 certificates to him. On these issues the parties went to a trial, in which the court held with Farquhar, and entered a decree ordering Henderson to deliver to Farquhar the 19 certificates; that the Plymouth Oil Company pay Farquhar the dividends it was withholding on the stock; that Henderson's bill be dismissed; and that he pay Farquhar and the oil company their costs. From such decree this appeal was taken.

After argument and due consideration had, this court is of opinion the court below was in error in dismissing Henderson's bill, in not awarding him the relief prayed for, in not dismissing Farquhar's bill, and in not imposing the costs of Henderson and the Plymouth Oil Company upon Farquhar. Our reasons for so holding we now state.

[1] In marshaling the pleadings and parties, it will appear that the real issue in dispute was between Henderson and his cestui que trustents and Farquhar, all of whom were citizens of Pennsylvania, and, were this all, the court below would have been without jurisdiction. But the oil company, which was a citizen of Delaware, while a mere stakeholder, was a necessary party to the relief which both Henderson and Farquhar sought. If Henderson prevailed, the oil company by decree would have to transfer on its books the 19 certificates and pay the withheld dividends, and if Farquhar succeeded the oil company would be decreed, as was indeed done, to pay Farquhar the withheld dividends. Such being the case, we are of opinion the court below had jurisdiction.

[2] Turning, now, to the status of the parties under the pleadings and proofs, we have this situation. The 19 certificates are in Henderson's possession and over Farquhar's admitted signature he has assigned them, "for value received," and given an irrevocable power of attorney to transfer them on the books of the company. The acts of the parties, possession by Henderson, acknowledgment of value received, and irrevocable powers of attorney by Farquhar, vest the legal title in Henderson, and the burden rests on Farquhar to defeat such legal title. This he seeks to do on two grounds: First, that the transfer was made without consideration; and, second, that, even if made on due consideration, it was made by him under duress and threat of imprisonment.

These two grounds were by the court be-

low, and will be by us also, considered separately, for it is manifest that, if the first ground be made good by Farquhar, there is no call to consider the second. Turning, then, to the alleged lack of consideration, we note the court below aptly summarized the issue between the parties, and its finding of fact thereon, as follows:

"It is the position of the plaintiff and his associates, Lockhart, Budd and Wilson, that they were deceived by the representations of Farquhar, who sold them the stock, that the outstanding capital stock was 350,000 shares, whereas in truth the common stock outstanding was 1,050,000 shares, and that, acting under the belief so induced by Farquhar's misrepresentations, their several purchases were made."

And its finding thereon as follows:

"But I find the evidence so strongly preponderating as to practically compel the conclusion that such false representations were in fact made by Farquhar as claimed on behalf of the plaintiff. While Farquhar flatly denied any such misrepresentations, as against his denial we not only have the positive testimony of Henderson, Lockhart, Budd, and Wilson, but the strongly corroborative evidence of five others, men of standing and reputation in the business life of Pittsburgh, to whom similar representations were made during the same general period of time, and concerning the same subject-matter, viz. the amount of capitalization of the Plymouth Oil Company."

A study of the proofs satisfies us that such finding was justified. Without entering into the earlier acts which led up to the formation of the Plymouth Oil Company, we note that it had a capital stock of 1,200,000 shares, with a par value of $5 per share; that 150,000 of these shares were preferred, with a conversion privilege into common stock, for which 150,000 shares of common remained in the treasury to meet such conversion agreement. The remainder of the common stock, 900,000 shares, the promoters of the corporation, including Farquhar, took as promotion profit, and he also acted as agent for the sale of the preferred stock, and it is alleged sold it to Henderson and others with the representation that only 350,000 shares of stock were outstanding, and concealed the fact that 1,050,-000 was outstanding. In that regard Budd, who was a personal and social friend of Farquhar, and a man of affairs in his position as vice president of one of the largest coal companies in Pittsburgh, and who made purchases extending over several months,

testified that Farquhar "always stated there never could be more than 350,000 shares of stock outstanding at any one time."

Wilson, a substantial business man of the city, who was a very close personal and family friend of Farquhar of many years' standing, and who had earlier had Farquhar in his employ, was approached by him to buy stock, which he did, and Farquhar "told me that the promoters were to get 50,000 plus any that they didn't have to use in selling the preferred. That was in answer to my question. He then showed me how, at any time, whatever holdings I had, divided by 350,000 would be my percentage of the company." Lockhart, another substantial business man, as sales manager of one of the large Pittsburgh coal companies, and a personal and family friend of Farquhar, also bought from him on the assurance "that the maximum amount of outstanding issue was to be 350,000 shares. * * * We discussed it almost every week up to the annual meeting, talked of it frequently, figured what the basis of the stock might be, and always on the basis of a total issue not to exceed 350,000 shares." William W. Henderson, the plaintiff, another substantial business man and an acquaintance of many years' standing, also bought a large amount of stock from Farquhar, stated that the matter was frequently discussed between them, and that Farquhar "always assured me that was the basis—350,000 shares."

Apart from these men, who, as will hereafter be noted, are charged by Farquhar with having duressed his action, there is testimony of other persons that Farquhar made the same representation to them as to the outstanding stock being only 350,000 shares. H. H. Patterson, a member of the Pittsburgh bar, who bought some stock, but not through Farquhar, testified he subsequently talked to Farquhar. "I asked him how much of the preferred was outstanding. He said to me that he didn't know exactly, because some of it had been converted, or was being converted about that time, but that the entire outstanding capital stock, when the preferred was all converted, would be 350,000 shares of common stock." Referring to another talk, Mr. Patterson says: "I took Mr. Farquhar to Mr. Kennedy, because I had tried to interest Mr. Kennedy in the stock. Mr. Kennedy wanted to discuss the matter with Mr. Farquhar. Mr. Farquhar then repeated to Mr. Kennedy in my presence a statement of the exact capitalization that was outstanding. Saying again to Mr. Kennedy, 350,000 shares when the preferred had

been converted." Mr. Kennedy, who was president of the Homestead Trust Company, Homestead, a suburb of Pittsburgh, testified that he had this conversation with Farquhar in the presence of Mr. Patterson, and that Farquhar then and at subsequent times, at a lunch table at the Duquesne Club and in the presence of others, said: "There weren't more than 350,000 shares outstanding." John W. Thompson, trust officer of the Union National Bank of Pittsburgh, and formerly trust officer of the Fidelity Title & Trust Company, testified that, in a conversation between Farquhar, James Henderson, now deceased, and himself, Farquhar said that the total issue of the Plymouth stock was 350,000 shares, and that after he heard this statement he bought his stock. Earl J. Mohn, a member of the Pittsburgh bar, testified that he had a talk with Farquhar about buying some stock, and that he afterwards did buy it. His account was: "Before I told him to make that purchase I said to him: 'It is my understanding, Rome, that the capital stock of the Plymouth Oil Company, issued and outstanding, does not exceed 350,000 shares.' Is that correct?" He answered: "It is correct."

Beside this testimony, showing representations made by Farquhar by word of mouth, there is written evidence of statements and list of stockholders furnished by Farquhar to Henderson at the latter's request, which, as they involve the names of persons not parties to this suit, we shall not discuss, further than to say the papers in our view support Henderson's testimony that Farquhar meant to deceive him by his oral statements, and used these misleading papers for the same purpose. The proofs show that none of these witnesses knew, until the stockholders' meeting of the company, held on June 23, 1925, that the outstanding stock, instead of being 350,000 shares, as represented by Farquhar, was in fact 1,050,000 shares, of which some 900,000 had issued to Farquhar and his associates. The matter was brought home to Farquhar by Lockhart, one of the witnesses quoted above, whose account of what Farquhar said about his own acts and representations is printed in the margin.[1]

In pursuance of this last promise, Farquhar met Wilson, Henderson, A. R. Budd, Lockhart, and C. M. Budd. Lockhart's account of what followed is given below.[2] Albert R. Budd's account of the meeting is found in the margin.[3]

---

[1] "Q. Now, when did you next see Mr. Farquhar? A. I called Mr. Farquhar's house the next morning, the 24th, about 7:30, and I asked him if he would stop for me on the way down town. He said, 'Yes,' he would be glad to. He came to my house in his car about 8 o'clock in the morning. I got in the car, and said, 'Jerry, what does this stock issue mean'? 'Well,' he says, 'it means that there is 1,050,000 shares outstanding, instead of 350,000 shares outstanding.' I said, 'Why haven't you said something about it to us before?' He said that he was trying to get together the stock necessary to restore our pro rata holdings on the basis of these representations. I told him that it was inconceivable, and I couldn't believe him, and I asked him if he wasn't simply being the goat for some one else, and if there hadn't been a recent change and manipulation of the stock of the company. He said 'No,' that he was the one that was wrong, that the company was perfectly regular, and that everybody connected with it was clean, and that he proposed to go broke, if necessary, to make us good, and give up everything that he had and possibly resign from the company. * * * I asked him if this wasn't going to put him in a very serious position. He says, 'Yes, it will.' He says, 'You can put me in the penitentiary, if you want; but it won't do you any good, because I am going to give you everything that I have.' By that time we had gotten down town, and he asked me if I would mind his coming up in the office with me. I told him certainly not. We got out of the car and went up to my office. 'Well,' I said, 'Jerry, am I to understand that you have willfully and deliberately lied to me for over two years with reference to the stock issue of this company?' He said, 'I don't know about the "wilful." ' 'Well,' I said, 'what would you call it?' He said, 'I guess you are right.' I told him, then, that I would like him personally to explain his position to our little crowd who had been associated together; that I didn't want to undertake to do it. He said he would be glad to meet with them; he had the meetings on in the morning, but as soon as the meetings were over, if I would arrange it, he would meet them at Henderson's office."

[2] "A. It was pretty much a rehash of my conversation with Mr. Farquhar of the morning. He very freely admitted his representations to us, and as freely stated that he was wrong, and that he was the only one that was wrong. He asked whom we thought he was obligated to, to make good. We said surely to ourselves, the J. F. Henderson estate, and to the people to whom he had spoken at the meeting the day before. He asked as to the number of shares of stock that would require, and we told him something in excess of 200,000 shares; we hadn't gone into it at that time. He stated that he would want to talk it over with his associates; that he intended to make us good, and, on our question as to when, he said within two or three days."

[3] "Q. And will you tell us in your own way, Mr. Budd, what occurred at that meeting in Mr. Henderson's office on the 24th? Was there a stockholder's list there? A. We asked Jerry what explanation he could make of the discrepancy as to the representation that he had made to us against what we found out at the annual meeting. He said: 'I can't explain it. I have no explanation to make; but I made those misrepresentations to you.' And he said: 'I am guilty, and I am alone guilty.' And I think I asked him when was the capitalization increased. He said: 'It has always been that way.' I said: 'If it was always that way, why didn't you tell us? What was the occasion for misrepresenting it to us?' He then said: 'Well, if I had told you the correct amount of stock outstanding, would you have bought any stock?' He said: 'Would any one have bought any stock?' I said I wouldn't.

"Q. Go ahead. A. And then Mr. Henderson presented two papers, and asked Mr. Farquhar if he recognized them, and he says: 'Yes; those are the statements I gave you. They are my statements, but they are incorrect.' He said: 'I am wrong,

Clifford M. Budd, a brother of the preceding witness, who had come to Pittsburgh to attend the stockholders' meeting on the 23d, went to his brother's office on the afternoon of the 24th. Finding his brother out, and learning he had gone to Henderson's office, he went there to look for him, and when the office girl announced his name to the meeting they told him to come in. His account of what happened is set forth in the margin.[4] Wilson's testimony is also found in the margin.[5] Henderson's testimony was to the same general effect.[6]

Lockhart, p. 242; A. R. Budd, p. 304; C. M. Budd, p. 440; Henderson, p. 524 of the record—testify that it was arranged Farquhar would meet them the next day, the 25th. What happened at the meeting on the 25th is given in the margin.[7]

made this inquiry in the directors' meeting that there had been 1,050,000 shares of stock out ever since the construction of the company, and he went on to read from the minutes, and made that statement that it had always been so with the company. And we all expressed great surprise at what he told us, and the deception that had been practiced, and the facts were, as he admitted frankly, that there had always been 1,050,000 shares.

"Q. That is, Mr. Farquhar admitted? A. Yes, sir.

"Q. What did he say about what he said to you? Did you take up with him about this 350,000 shares? A. Oh, yes; he said he had represented it to be 350,000 shares as the entire amount of stock that would be out at any time; that the fault was all his; that he had deceived us; that the things he said were not true, and he felt very badly about it; but why he did it, he wouldn't tell. He would say: 'It is just my fault; it is all my fault; the company is all right: I am wrong.' * * *

"Q. What did he say he was going to do? A. He said he was going to give everything he had; that the matter must be fixed up; that we were entitled to our stock. We then discussed—somebody said, possibly I did—that it would require more than showed on the stockholders' list in his name. He said, well, he would have to get stock from his associates in the matter to make it good, but we was all entitled to two shares for each one we had."

[4] "Q. When you got in, who were in the meeting? A. Why, Farquhar was there, Wilson, A. R. Budd, and Henderson.

"Q. Mr. Lockhart there? A. And Lockhart.

"Q. Now, tell his honor, if you will, what you heard take place there, Mr. Budd? What the conversation was while you were there? A. Well, they had been in meeting for some time, and I heard Farquhar ask Henderson for the stockholders' list, and he says: 'Yes; here it is. I have had it photostated.' And they asked—Jerome did a lot of talking, and he said: 'Well, how could it come about that this change in capitalization was made? How can you explain it?' 'Well,' he said 'I just can't explain it,' he says; 'but you will be all made whole.' 'Well, how will you make us whole?' 'Well, we will make you whole if it takes every share of stock and every dollar I have got.' And different ones asked him, 'Jerry, how could you—knowing us as you do, how could you—make this mistake?'

"Q. Who asked him that? A. Various ones in the room said, 'How could you make this mistake?' 'Well, I don't know; but the company is as clean as a hound's tooth.' 'Well, how can it be as clean as a hound's tooth, when you represent to us that there were 350,000 shares of stock, and now it appears there is over a million shares?' 'Well, you are going to be made whole, and get two shares for every share you have got.' 'Well, when?' 'Just give me time.' "

[5] "Q. All right. Tell us what you remember happened at all of them, and tell us at which meeting it happened, if you can. A. Well, he repeated to the meeting practically the same thing that he had told me in his office, that he was going to make good his misrepresentation; he was going to see friends who would help him do that. And he was asked if he knew how much stock that would take. 'No; he didn't.' He was shown a list and asked 'if these were all the parties that should be taken care of.' He looked at it just casually and said that there was somebody on there—I believe it was Mr. Stone—he had made no misrepresentations to. 'Anybody else?' He looked at it again, and said: 'It doesn't make any difference. Anybody that I have made these misrepresentations to, or that you fellows did.' I asked him if he meant J. F. Henderson estate. 'Why, certainly.' 'Well, how about Mr. Earl J. Mohn?' 'Yes; you told him.' "

[6] "Q. Will you tell us, the best you can, what took place at that meeting on the 24th in your office? A. Well, there was present Mr. Lockhart, Mr. Budd, A. R. Budd, Mr. Wilson, myself, and Mr. Farquhar. A few minutes later, after we had been there a few minutes, Mr. C. M. Budd came in. We had a very general talk, expressed by everybody, that we were very much surprised at the situation, because I had told them. I stated then and there that Mr. Adams had told me on the 23d, when I

[7] Lockhart's testimony:

"Q. Was anything said by him at that time about it being impossible for him to get the stock to make up this list? A. No; he was still reporting progress. He said that he had talked with these two gentlemen, and that he expected fully to be able to make us good; but that was his intention, that he proposed giving up his stock for that purpose. There was a discussion as to the amount of stock that he had in his name, and it was somewhere around 68,000 shares. He stated that all of that stock was not available; that some of it was up as collateral, and as I recall it, he said that there were about 53,000 shares which he had which was free. In the course of that conversation Mr. Farquhar asked, if he put up his stock, if we would release him from personal liability. We told him, 'No,' we would not; we wouldn't release anything until we had been restored to the same basis as our original purchase. Mr. Farquhar said that he thought, if he was going to have to defend himself, he ought to keep this stock, and he said, however, regardless of how that action might terminate, that he proposed to give us all he had, to make good his promises. We told him that that was a matter for him to determine; we couldn't release him."

Albert R. Budd's testimony:

"Q. Where was the meeting? A. In Henderson's office.

"Q. What was said at that time? A. We asked Jerry if he had anything to report, and he said, 'Yes,' that he had seen some people, and, on being asked whom, he said that he had seen Mr. Parriott and Mr. Adams, and that both of them had agreed to help him out; and that he had not been able to get enough stock to—or had not been able to get hold of any stock as yet, again admitting that he was all wrong in his statements to us, and he still proposed to restore us to our position, and that, if he was given sufficient time, he could get the stock to do so. * * *

"Q. Was anything said to you at that time about any waiver of claim against him? A. Jerry asked, if he would give us 10,000 shares of stock, would we release him from any personal liability.

"Q. And what was said? A. And we told him,

The proofs show a meeting was arranged for on the 26th. The testimony of Wilson as to what happened at the meeting on the 26th, in answer to the question, "Tell us anything you remember about it," is set forth in the margin.[8] And Lockhart's ac-count of the meeting and the subsequent transfer of the stock is set forth below.[9]

Lockhart's account as to what took place at the meeting on the 26th is corroborated at

---

'No;' that we wouldn't release him from—that we wouldn't waive any right of action which we may have, in order to restore our position for ourselves and our friends.

"Q. And what did he say to that? A. Well, he said that, if that was the case, he had better keep his stock to defend himself; however, regardless of the outcome of any litigation, whatever stock he had, he still proposed to turn over, whether he won or lost his litigation."

C. M. Budd's testimony:

"Q. Now, tell me in your own way what was said by Mr. Farquhar and what was said by the other gentlemen, any of them, the best you can remember. A. Well, they asked Mr. Farquhar what progress he had made, and he didn't have much to say, didn't make very good progress. 'Whom did you see?' 'I didn't get a chance to see very many of them, but I saw Parriott and Adams.' 'Any success?' 'Well, not particularly.' 'Well, we are not getting along very well.' 'No; we are not getting along very well; but you dealt with me before, and you know that what I tell you I will do; I will do, and I will do it, if it takes everything I have got. I am going to make good in this matter.' 'Well, what are we to suppose in this matter? You haven't done anything yet.' Different ones were talking. Mr. A. R. Budd was asking him questions, and Mr. Henderson, and he says: 'Well, if it takes every share of stock I have got, I am going to put it up and make you folks whole.' "

Henderson's testimony:

"Q. Was anything said about his own personal liability at that time? A. Yes; he said he realized that he had made an awful mistake; that it was the first mistake he had ever made in his life, and that this thing was very bad, for him to lose his friends in this way, or to get into a controversy with his friends about this, and that it reflected on him and his family, and if we were so disposed we might follow him and make criminal charges against him; and he was very penitent and regretful that it had happened, and I told him myself, 'Jerry, it is very important that you didn't think about your family and those things before you did this;' but there was nothing said by me about any criminal proceedings.

"Q. Was there any threat of criminal proceedings made against him on that day? A. No, sir.

"Q. Did he make any request for waiver of release of liability that day? A. Yes, sir.

"Q. What did he say? A. He said, 'If I give you all the stock I have, will you release me from all responsibilities in the matter?' And we told him, 'No.' "

[8] "A. The literal conversation was: Mr. Henderson said, 'How much stock can you deliver to-day?' And he said, '50,000 shares.'

"Q. Go on now and tell us all about it. A. He was then asked, either by Mr. Henderson or by Mr. Budd, how he would deliver, and he said, 'If Walter goes over to my office, I will give it to him.'

"Q. Did you go over with him? A. I did.

"Q. What happened when you got over to his office? A. We walked in, and he got the certificates, either out of his desk or his safe, just behind it, and he counted out 50,000 shares, indorsed them, and handed them to me.

"Q. And you brought them back to the office, Henderson's office? A. Do you want more of what happened there?

"Q. Yes. A. Well, as he was handing me the certificates, he said: 'They can't do anything. I don't see why they won't give me more time and not be so unreasonable. I just heard 15 cases where there would be no liability, because there was no damage, no loss, no money lost.' I wasn't interested in them. I was back in Henderson's office in 15 minutes, with the certificates.

"Q. And whom did he say he had heard these 15 cases from, Mr. Wilson? A. I couldn't say for sure, but I believe he said Mr. Adams; he said his attorney—an attorney.

"Q. He said he had heard these cases from his attorney? A. Yes.

"Q. When you got back to the office, and the certificates were delivered to Mr. Henderson, did you and Mr. Henderson and the others then sign up this memorandum as to what should be done with them (handing paper to witness)? A. Yes, sir."

[9] "Q. Now, tell us what went on at that meeting, if you will—as fully as you can. A. Mr. Farquhar stated that he had to take a trip to Texas on business of the company, and that he would not be in position to fulfill his promise within the two or three day period that he had originally told us would be sufficient time, and that it would require an additional ten days for him to see the people necessary to get the stock to make us good, and he asked if we would give him an additional ten days in which to consult with his associates and secure the stock, offering us at that time 10,000 shares of his stock as an evidence of his good faith. Mr. Henderson left the room, and came back in a few minutes and called us out, and we were discussing in a back room in Mr. Henderson's suite the fact that we had waited three days—

"Q. Well, I don't think you can tell what you discussed back there. And who went back into that room? A. Mr. Henderson, Mr. Budd, Mr. Wilson—that is, Mr. A. R. Budd. Mr. C. F. Budd wasn't at that meeting.

"Q. Mr. Davis says he hasn't any objection to your stating what was discussed in the back room; so tell us, Mr. Lockhart. A. Well, our feeling was, we had waited 3 days and had obtained absolutely nothing. Farquhar, with some 50,000 shares, offered 10,000 shares, in the face of his promise to restore us to our original position, and use all his stock to do it, and we didn't feel that that was sufficient evidence of good faith. While we were talking, the door opened and Mr. Farquhar, in a low tone, speaking to Mr. Henderson, said that he would make it 25,000. He said that he was in a hurry; that he had some business to transact; and Mr. Henderson asked him to step back into the front office and we would be with him in a minute. We decided that, unless—if I am permitted to say that —unless Mr. Farquhar was willing to put up substantially what stock he had, that is, 50,000 shares, it would not be acceptable to us, and we went back and told him.

"Q. What did he say? A. He said, 'All right,' that he would give us the 50,000 shares. He asked, however, that we say nothing about it. He said that we could readily understand that, if his associates understood that he had given up 50,000 shares, he would have difficulty in getting them to do their part, and he wished us to keep that to ourselves, and we all promised him that we would.

"Q. What did he say about the transfer of the shares, or anything about that? A. He said he would give us that stock, and we could divide it as we wished. Mr. Henderson asked him how and when. He said: 'If Mr. Wilson will go with me to the office, I will be glad to give it to him.'

"Q. Was anything said about a writing or a receipt, or anything of that kind?' A. We asked him if he wished us to give him a receipt or a writing of any kind, and he said he didn't desire anything; that we could divide the stock as we wished.

"Q. Then what? A. There was some talk with him with reference to an audit, and he told Mr.

length by Henderson, and the proofs show that Farquhar had to go out of the city for a trip of some length, and a meeting was arranged to be held on his return. In that regard the testimony of Lockhart is found below [10]—testimony which, without quoting the same, is corroborated by the other parties. If believed, the testimony of these men above quoted shows, first, that Farquhar had untruthfully misrepresented to the plaintiff and other persons that there were only 350,000 shares of stock outstanding, when in fact there were 1,050,000 shares outstanding, and that instead of each shareholder of stock so bought being an owner of one $\frac{1}{350000}$ share in the Plymouth Oil Company, he was the owner of but $\frac{1}{1050000}$ part thereof; second, that, on being confronted with such fraud by the purchasers, Farquhar acknowledged the wrong done and sought to make restitution; third, that to make such restitution he would have had to deliver "something in excess of 200,000 shares," which he undertook to try to do; fourth, that in part reparation for the fraud he had committed, and as an earnest of his purpose to try to make entire reparation, Farquhar transferred at once the 50,000 shares of stock he held.

[3] Assuming for present purposes these facts are established, it would seem to follow, first, that as heretofore stated these certificates, indorsed by the owner and being in the possession of the plaintiff, show a complete legal title vested in the plaintiff by the acts of Farquhar; second, that the proofs noted above show that the transfer of the stock being in reparation in part by Farquhar of his fraud committed, and in an endeavor on his part to recompense the plaintiff and his associates, establishes the existence of a sufficient moral consideration for this transfer; and possession, under the executed transfer, vests an equitable ownership. Such a transfer is not a mere gratuitous one, but is based on a moral duty, or,

as Bouv. Law Dict. p. 613, expresses it, "moral considerations are such as are based upon a moral duty," and while in many jurisdictions the law is otherwise, in Pennsylvania, whose law is applicable in this case, the rule as stated in Hemphill v. McClimans, 24 Pa. 371, "is a very familiar one, that an existing moral duty, not enforceable by law, is a sufficient consideration for an express promise to perform that duty." See, also, Shenk v. Mingle, 13 Serg. & R. (Pa.) 34.

But we are here dealing with a stronger case. This is not a suit by plaintiff to compel Farquhar to do a moral duty, but is the case where Farquhar had done the moral duty, has vested the legal title and confirmed the equitable title, and now seeks to undo the moral duty by the grace of a court of equity. We have before us, not an executory promise, but a performed act. Shall a court of equity tell Farquhar that the sense of justice which led him to execute this transfer was a mistaken sense of justice on his part, or will equity refuse to disturb such an existing equitable situation unless Farquhar shows other and sufficient grounds?

[4] Turning, then, for our own examination, to the first question above recited, we inquire whether Farquhar did fraudulently misrepresent to the plaintiff and his associates the outstanding stock of the corporation. The testimony we have quoted, if believed, shows Farquhar so did. On the other hand, his testimony, and its stands alone, says he did not. The fact is basic. If Farquhar committed no fraud, if no consequent moral duty of reparation existed, the transfer of this stock to Wilson, confessedly without other consideration, must be set aside, and, without reference to all other questions, a decree be entered ordering the plaintiffs, the mere nominal holders, to transfer the stock to Farquhar, the real owner. To aid him in determining the fact or otherwise of Farquhar's fraudulent misrepresentation, the judge below had the benefit of seeing and hearing all the witnesses, and his conclusion was:

"But I find the evidence so strongly preponderating as to practically compel the conclusion that such false representations were in fact made by Farquhar as claimed on behalf of the plaintiff. While Farquhar flatly denied any such misrepresentations, as against his denial we not only have the positive testimony of Henderson, Lockhart, Budd, and Wilson, but the strongly corroborative evidence of five others, men of standing and reputation in the business life of Pittsburgh, to whom similar representations

---

Henderson—or Mr. Henderson had asked him for a letter authorizing our auditors to go over the books. He said that it wasn't necessary to have any letter; that he would arrange it with his associates at the office, and we could go through the affairs of the Plymouth Oil Company fully and completely. Then he left the office with Mr. Wilson."

[10] "Q. Now, when Mr. Farquhar said he would turn over the 50,000 shares, was anything said about a further meeting or further action on his part on this? A. Yes, sir; he asked for an additional ten days to see his associates and discuss with them the questions of helping him out with the additional amount, and the ten days' time brought it to July 6th, and it was agreed that we would meet again on July 6th.

"Q. Did you meet again on July 6th? A. Yes, sir."

were made during the same general period of time, and concerning the same subject-matter, viz. the amount of capitalization of the Plymouth Oil Company."

We ourselves also so find. Seeing, then, that the plaintiff holds the legal title to this stock, that he has an equitable title or claim to retain it as against the defendant, by reason of the fact that it was conveyed by the defendant as a partial reparation of a fraud he had committed upon the plaintiff and his fellows, it follows that they are entitled to a decree ordering the company to transfer the same on the books of the company, unless the defendant, who has become himself by his cross-bill a suitor seeking affirmative relief, shows his right to such relief. That affirmative relief is practically the same as though he had filed an original bill, praying a delivery of the certificates to him. In seeking such relief he is met by the legal burden that he had been guilty of fraud, and by the evidential burden that in the court below and in this court he stands as a discredited witness.

What, then, is his ground of cancellation? What testimony does he marshal to support this, his second claim or issue? Assuming as we do, and accepting as he must, the fact that the title, legal and equitable, is in the plaintiff, he contends that the actual conveyance of the 19 certificates was not his act, but was an act forced upon him under threat of prosecution, and therefore done under duress. Such is his contention. On the part of the plaintiffs it is asserted that, having been guilty of the now adjudged fraud, conscious of the fact that he had committed a criminal act, and had abused the confidence of his trusted friends, he voluntarily transferred those certificates of his own free will and accord as a partial reparation for the wrong he had done Henderson and his associates. This brings us to the question: What were the facts in that regard on June 26, 1925, when in his office Farquhar indorsed the 19 certificates and delivered them to Wilson? Did he do so under duress, as he claims, or in reparation, as the plaintiff avers?

Turning to the proofs that Farquhar made the transfers, we here note that in our view the crucial time and situation in this case is June 26th, when Farquhar in his office transferred those 19 certificates to Wilson. What he or the plaintiffs subsequently did cannot affect what was then and there done on June 26th in his office, with this qualification: That such subsequent acts by both parties may or may not be evidential, as supporting or discrediting their testimony as to what took place before the transfers were made on June 26th.

[5] Turning, then, to the proofs in support of Farquhar's cross-bill, praying delivery of certificates, we find his claim for relief is based solely on his own testimony, and, as bearing on the fact that the transfer was made under threat of imprisonment, his proof is as follows: Referring to a meeting with Henderson, Budd, Lockhart, and Wilson at Henderson's office on June 25th, Farquhar testifies that (referring, it will be observed, to a threatened prosecution of his fellow promoters for a fraudulent issuance of stock) Budd then said to him, "Well, we say that you have represented there are only 350,000 shares outstanding." I said, "Your saying it doesn't make it true." He says, "There are four of us, and only one of you." And I said, "That still doesn't make it true." They then told me that, if I would tell my crowd over there that a criminal suit was about to be brought against me and them for a fraudulent issue of stock, I wouldn't have any trouble getting the 250,000 shares. Farquhar's testimony is given below.[11]

---

[11] "Q. What 250,000 shares? That is the first time you have mentioned that figure. Had they demanded 250,000 shares? A. In other words, they demanded 250,000 shares of stock, and asked me to go along with them and uncover the whole thing and have it all canceled. I told them it was absolutely impossible for me to get that much stock. At that time it was selling for $35 or $40 a share, and it amounted to approximately $10,000,000; it was absolutely out of the question.

"Q. Did they give you any message for Mr. Benedum? A. They did, sir.

"Q. What did they tell you to tell him? A. They told me, if I told Mr. Benedum and the rest of the crowd over there that a criminal suit was about to be brought against me, and them as well, for a fraudulent issue of stock, that I wouldn't have any trouble getting the 250,000 shares of stock.

"Q. What was your answer? A. I told them it was absolutely out of the question, and I couldn't do it.

"Q. Now, you have told all that you remember of the conversation at that time and place—have you? A. All that I recall right now.

"Q. You left them? A. I did, sir.

"Q. Where did you go on leaving? A. I went to my office.

"Q. How long were you in Henderson's office on that occasion? A. I would say an hour and a half.

"Q. After you reached your office, did any one of the four communicate with you? A. Yes, sir; Mr. Wilson called me on the telephone.

"Q. How did you know it was Mr. Wilson? A. I knew his voice, having talked to him at various times.

"Q. What was your telephone conversation with Mr. Wilson? A. He told me that he wanted me to take the matter seriously; that Henderson was in earnest, and that I would have to do something, and he wanted me to think it over carefully.

"Q. What was your reply? A. I told him there had been nothing wrong with the formation of the company, and there wasn't any chance to cancel the stock.

"Q. Did Wilson in that conversation say anything about the 50,000 shares? A. He did. He told me it was one of two things, either join them or get 250,000 shares of stock."

As to what transpired on June 26th, Farquhar's testimony is set forth in the margin.[12] Noting as above the testimony of Farquhar in support of his cross-bill we must summarize the testimony in contradiction thereof. To start with, we have the finding of the court below and of this court that Farquhar had practiced a fraud upon Henderson and his associates in the several sales of the stock to them, and had thereby sold them stock which only represented one-third of its represented participation. Such being the facts, and that they were induced to part with their money by reason of the false representation that only 350,000 shares of stock were outstanding, when in fact there were 1,050,000 shares outstanding, it would seem they had reasonable grounds for making a criminal charge against Farquhar under the Criminal Code of Pennsylvania (Act March 31, 1860, § 111 [P. L. 382; Pa. St. 1920, § 7847]), which provides: "If any person shall, by any false pretense, * * * obtain from any other person, any * * *

---

[12] "Q. When did you next see Henderson, Budd, Lockhart, or Wilson? A. On the afternoon of June 26, 1925.

"Q. Where? A. At Mr. Henderson's office.

"Q. How did you happen to be at Henderson's offices on that day? A. Mr. Henderson called me up and asked me to come over to his office right away.

"Q. Did you go? A. I did, sir.

"Q. Whom did you find there? A. Mr. Budd, Mr. Lockhart, Mr. Wilson, and Mr. Henderson.

"Q. What conversation took place that day? A. When I went in the office, they asked me if I had made up my mind to join them. I told them that I had not, and couldn't do it; that I wouldn't turn my associates down; there had been nothing wrong with the formation of the company, and that it couldn't be done.

"Q. Go ahead with all the conversation that you remember. A. Mr. Henderson then asked me if I had gotten the 250,000 shares. I told him that I had not. He said, 'Do you realize the hole you are in?' . I asked him what he meant. And when I entered Mr. Henderson's door I saw a constable standing out in the hall.

"Q. How did you know him to be a constable? A. Because he had been at my house to arrest my chauffeur approximately two months before that, some time.

"Q. Have you since learned what the name of that constable is? A. Yes, sir.

"Q. What is his name? A. John Magee.

"Q. He was outside when you went into Henderson's office? A. He was, sir.

"Q. All right. Now go ahead with the conversation in Mr. Henderson's office. A. Mr. Henderson then said: 'Unless you agree to join us and uncover this whole thing, or else get us 250,000 shares of stock, you are going to be put in jail. We have sworn out warrants for you on four different counts, three charging you with obtaining money under false pretenses, and one for issuing a false statement as an officer of a corporation.' I told him that I had not made any false statements or obtained any money under false pretenses. He says: 'That doesn't make any difference about it. We have these warrants sworn out, and unless you are willing to do one of these two things, we are going to have you thrown into jail. You will be sent to the penitentiary, you . will be disgraced and ruined; your bank loans will be called; and your family will be disgraced.' I said: 'You men certainly wouldn't do anything like that, after what I have done for you. I put you into this company; you got into it throgh me, and nobody else. You wouldn't have known a thing about it, if it hadn't been for me. You have bought stock which is now worth 20 to 25 times what you paid for it, and you are going to put me in jail for it.' I said, 'I can't believe it.' They said they would give me one more chance. At that Henderson, Budd, and Lockhart left the room, leaving Wilson there with me. He said, 'My God, Rome, you have got to do something.'

"Q. This was Wilson who said, 'My God, Rome, you have got to do something'? . A. Yes, he said: 'They aren't bluffing, they are going to have you arrested. The constable is here. You have got to do something quick.' I started to tell him what a fine gentleman he was, after what I had done for him, to be a party to a scheme like that. He said that he had not joined in the criminal proceedings. I said, 'Well, you might as well have.' With that, Henderson, Budd, and Lockhart returned to the room. Henderson asked me if I had made up my mind what I was going to do. I told I had, and that I couldn't do what they wanted me to do. He then reached in his drawer and pulled out the stockholders' list, or the photostatic copy of it, as I recognized. He says: 'Here is something that you can do. I see by this list that you have sixty-odd thousand shares of stock standing in your name. Can you turn that over to us?' I told Mr. Henderson I didn't have that much available. He said, 'How much have you available?' I · told him 50,-000 shares. I said, 'Do you mean, if I will turn 50,000 shares of my stock to you, you will not have me arrested?' He says, 'That is exactly what I mean.' I said, 'Then, if I do turn over the 50,000 shares of stock to you, you will have the warrants withdrawn and it will settle the matter for me?' He said, 'That is exactly what I mean.' And Mr. Budd said, 'That will show your good faith.' And Mr. Henderson then said: 'Where is the 50,000 shares? Have you got it with you?' I said, 'No,' I didn't have it with me, I didn't · carry it around; but I told him it was in my safe. And he said, 'Walter, you go over with him and get it.' Mr. Wilson said, 'No ; let Rome go alone.' Mr. Henderson said, 'No ; he can't go out of this office alone.' With that, Mr. Henderson, Mr. Budd, and Mr. Lockhart left the room. They were gone a few minutes and while they were gone Mr. Wilson said, 'My God, get that stock quick.' When they come back they said, 'Walter, you are the man to go with him to get the stock.' We then left Mr. Henderson's office, and I with Mr. Wilson walked over to my office, me telling Mr. Wilson that was a terrible thing to do. We went to my office, and I went to my safe and took out my box. With that, Mr. Wilson locked the door. And I counted out 50,000 shares · of the common stock of the Plymouth Oil Company in my name and signed the certificates. Mr. Wilson then witnessed my signature, told me how glad he was that I had done it. He then got up and asked if he could use the telephone, called up Mr. Henderson's office, got him on the telephone, and told him he had the stock, and then left, and I went back to my office.

"Q. Those are the certificates which have been introduced in evidence here? A. I haven't seen them. I assume so. (Certificates previously identified as Plaintiff's Exhibit No. 1, shown witness.) A. Yes, sir.

"Q. You said a moment ago that you asked Mr. Henderson whether, if you turned over the certificates, it would mean you would not be arrested? A. I did, sir.

"Q. And he said that was what it meant? A. Yes.

"Q. Did he say what would happen if you did not turn them over? A. They all said that I would go to jail.

"Q. That was on the 26th day of June, 1925? A. Yes, sir."

money * * * with intent to cheat and defraud any person of the same, every such offender shall be guilty of a misdemeanor, and on conviction be sentenced to pay a fine not exceeding five hundred dollars, and undergo an imprisonment not exceeding three years."

On the morning of June 26th such criminal information was made by Henderson, Lockhart, and Budd against Farquhar, a warrant placed in the hands of a constable, and he was within distance and call of Henderson and his associates. In point of fact Farquhar was not then, or for two weeks thereafter, arrested, and the contention of the plaintiffs is that they neither told Farquhar of the fact that such an information was made, of their purpose to prosecute him, or that they duressed him to make the transfer under threat of prosecution.

Turning, then, to the testimony, we have first that of Magee, the constable, who was called by Farquhar, and who says he went to the building in which was Henderson's office in company with Henderson and some of the others; that "he went up on the elevator, got off the elevator, and was taken to an office on one of the floors, and was told to sit there and await orders." In answer to the direct question by Farquhar's counsel, "Did you see J. G. Farquhar at Mr. Henderson's office on the 26th of June?" his answer was, "No, sir; not to my knowledge." And as corroborating Magee we note the testimony of Budd that Magee was where Farquhar could not see him, viz.:

"Q. Mr. Budd, was Mr. Magee anywhere, any time you saw him, or any time you did not see him, where Mr. Farquhar could see him, in that office that day—the constable? A. No; he couldn't be seen.

"Q. Did anybody say that Mr. Magee was there? A. No.

"Q. Or that a constable was there? A. No."

We have heretofore quoted the testimony of Lockhart bearing on Farquhar's fraudulent representations of outstanding stock, and, confining ourselves now to threats of criminal prosecutions, we add to this the further testimony of Lockhart on the subject of duress.[13] This should be read in connection with his preceding quoted testimony.

Referring to the meeting of June 26th, the testimony of Farquhar is found below.[14] The several statements of Farquhar, which have been quoted, that threats were made, were called to Lockhart's attention, and he categorically testified that no such statements as testified to by Farquhar were made.

This leaves the testimony of Farquhar and Lockhart, as to criminal threats, balanced, a situation where a chancellor might well hesitate to undo what the parties had done and decree a surrender of the transferred certificates. But the proofs do not end with Lockhart. His testimony is corroborated by Albert R. Budd, who also categorically denied each of the quoted statements made by Farquhar, and added:

"Q. Mr. Budd, at any of those meetings, 24th, 25th, or 26th, was a statement made, or any statement made, to Mr. Farquhar that he would be arrested, or was there any threat of arrest made? A. No threat of arrest made at any time. Mr. Farquhar admitted his liability, and he was the only one that made any reference to going to the penitentiary."

Referring to the meeting on June 24th, Clifford M. Budd, in answer to the question, "Now, Mr. Budd, was anything said at that meeting that you heard about a criminal prosecution, or jail, or penitentiary, or anything like that?" testified, "No; no; not a thing." The testimony of Wilson contradicting Farquhar was as follows:

"Q. Well, do you remember anything else that happened on the 24th? A. I know some things that didn't happen.

"Q. Well, tell me anything that did not happen then. A. Well, he never was threatened in any way, shape, or manner.

"Q. Well, how about what did not happen on the 25th? A. What did not happen?

"Q. Yes. You say you know things that did not happen. Was he threatened on the 25th? A. No; nor on any other date."

He also denied categorically that each of the quoted statements made by Farquhar as to criminal proceedings were made by Farquhar.

---

13 "Q. Was any threat of criminal proceeding against him made by any person in your hearing, or by you, that day at that meeting? A. Absolutely not.

"Q. Mr. Lockhart, did Mr. Farquhar at that time, on the 25th, assert that he had not made representations concerning 350,000 shares to you gentlemen? A. At all the meetings Mr. Farquhar very freely admitted that he had made those representations to us, and that he alone was the guilty party."

14 "Q. Now, when Mr. Farquhar said he could turn over the 50,000 shares, was anything said about a further meeting or further action on his part on this? A. Yes, sir; he asked for an additional ten days to see his associates and discuss with them the question of helping him out with the additional amount, and the ten days' time brought it to July 6th, and it was agreed that he would meet again on July 6th.

"Q. Did you meet again on July 6th? A. Yes, sir.

"Q. Where—oh, by the way, excuse me, I forgot to ask you—on June 26th was anything said by you, or anyone else, in your presence, about criminal proceedings against Mr. Farquhar? A. Never anything of that nature was said at any time in any of the meetings."

The testimony of Henderson that at the meeting on June 24th nothing was said "with respect to warrants or criminal prosecutions"—Henderson's testimony as to Farquhar, but no one else, calling the matter of criminal charges—has been quoted above in discussing the matter of fraudulent representations. Referring to the statements made by Farquhar that threats of criminal procedure had been made at the several meetings, Henderson testified no such statements as testified to by Farquhar were made.

Turning to the question of the likelihood of these men threatening Farquhar, as he testified, and avowing their intention of sending him to prison, we have the testimony that their counsel "had told us to take any stock that he (Farquhar) volunteered to put up, but not to threaten him with any criminal proceedings, and we were being careful not to." Indeed, had they been inclined to disregard the advice of Mr. Thorp, whose advice would naturally carry weight with and impress them, there was no need to threaten Farquhar with imprisonment, for the testimony of different ones is that Farquhar was his own accuser and keenly recognized his liability to imprisonment. On the morning when none of the others had discussed the matter, and at a time when there is no suggestion that any pressure had been brought on him, and while alone, with Wilson, the latter testified Farquhar said to him, "You can put me in the penitentiary if you want, but it won't do you any good, because I am going to give you everything that I have"—thus showing a purpose on his part to make reparation.

At the subsequent meetings, and before the information was made, he stated substantially the same purpose. Indeed, without referring to the testimony in detail, we limit ourselves to saying that we find the facts were substantially as follows: Confronted with the situation that he had made misrepresentations to friends and intimate associates, Farquhar frankly conceded his liability to imprisonment, and voiced the honest purpose to make reparation by giving up all the stock he held, and endeavoring to get his associate promoters to help him out by turning over some of their stock; that Henderson and his associates, whether rightly or wrongly there is no call for us to decide, regarded Farquhar as having been made a stool pigeon by his associates, and that they should help Farquhar out, as their stock had profited by his misrepresentations in getting from Henderson and his associates the development money that made

their stock valuable, and that Farquhar should force them to help him make good his misrepresentations; that during the several meetings this was their purpose, but as the time passed and Farquhar was unable to get such help, they on the 26th insisted that Farquhar, as an evidence of his purpose to make reparation, should make good to the extent of his personal holdings before making his proposed trip to Texas.

The key to the whole situation, we think, is illustrated by the testimony of Wilson. He was the close, intimate, and family friend of Farquhar; the latter's son was called for him, and he seemed to be the one to whom Farquhar turned, and who on his part had confidence in Farquhar, up to the time of his going to Texas, and indeed later. Wilson, while he knew of his associates making the information, took no part in doing so, and testified that, if he had been consulted about it, he would have advised against it. In the face of his own personal loss, and of his recognition of the fact that Farquhar had deceived him, his relations to him were such that he was unwilling to prosecute, and held to his belief that, if given time, Farquhar would make reparation. His testimony that Farquhar voluntarily made the transfers on the 26th, that he requested him to go with him to his office and get the certificates, and that no threats of prosecution were made, all unite, corroborated as they are by the other witnesses, to carry conviction and satisfy us that Wilson's are the words of truth and verity. And in that connection, and as bearing on the absence of duress, we have the testimony of Wilson that, while he knew an information had been made by the others, he did not know a constable was brought to Henderson's office, and, though he saw Magee there later in the day, he did not know he was a constable until he learned it after the meeting. And that the transfer was voluntarily made would seem the most natural thing under the circumstances.

Farquhar had deceived, not only the plaintiff and his associates, but other social, club, and business friends, who had taken his word and made no further inquiry; he was confronted with loss of his standing; he was, self-confessedly, subject to criminal prosecution. All these factors united to lead him to justly make such immediate reparation as he personally could, and to promise such future reparation as other friends might give to relieve him from the situation he had himself created. Finding, then, as a court of equity does, these certificates, duly

indorsed by Farquhar, in the hands of those whom he had wronged, we are of opinion that Farquhar has shown no proofs, in law or equity, for now compelling the holders of these certificates to return them to the one who wronged them. That the stock they originally got has, by the expenditure of the money they furnished, subsequently grown tremendously in value, in no way changes the fact that Farquhar induced them to enter into the venture by representing that their interest in the outcome of the venture was three times what it really was. Nor are we concerned with the relative rights, either actual or supposed, of the plaintiff and his associates on one side, and the promoters of the company. The issue here is between Farquhar and the plaintiff and his associates, and on that issue our findings and conclusions are as we have stated.

It follows, therefore, the decree below must be vacated and the cause remanded, with instructions to enter a decree, first, reinstating Henderson's bill; second, entering a decree directing the Plymouth Oil Company to transfer the 19 certificates in question and to issue new certificates to the plaintiff; third, to dismiss Farquhar's cross-bill; fourth, to enter a decree against Farquhar for the plaintiff's costs, the Plymouth Oil Company's costs, and also for interest on all dividends upon the stock in question from the time the same were payable; and to grant such other and further relief as may be necessary to carry out the decision of this court.

WOOLLEY, Circuit Judge (dissenting). While I have the utmost respect for the views of my associates in this case, the judgment of the court is so important and, if wrong, it will work so grave an injury to one of the litigants that I am impelled by a sense of duty to dissent. In briefly giving my reasons I shall first attempt, conformably with our Rule 24, to find and state the precise question involved. It may be well to note preliminarily that this is not an action on a contract; nor is it an action in deceit; nor an action, civil or criminal, in which the appellee is on trial for wrongdoing. It is an action in equity based on duress charged against the appellant. The question of duress is one purely of fact and that question is a singularly narrow one. In substance it is this: Confessedly having at hand all the machinery of duress, did the appellant use it, or, using it, did the appellee know it and yield to it?

"Cujusque rei potissima pars principium

est." Therefore, I shall give, though in merest outline, the genesis of this controversy, referring to the opinion of the learned trial judge (D. C.) 13 F.(2d) 932, for the facts in adequate detail and to the opinion of the Chancellor of Delaware in a case bearing the same title (Del. Ch.) 131 A. 165, and (Del. Ch.) 136 A. 140, for the facts at greater length.

One Frank T. Pickrell and his associates had acquired oil leases on about 10,240 acres of unpromising land in Texas. They sunk a well and in May, 1923, struck oil of high quality in commercial quantities. They were required by the terms of the leases to drill additional wells. After starting two of them they became financially embarrassed and sought assistance of L. M. Benedum of Pittsburgh, Pa. The well that was first sunk continued to flow in a way to convince geological observers that it was drawing from a large pool nearby. Benedum had the property scientifically explored. The reports were so encouraging that he and his associates entered into an arrangement with the Pickrell group whereby two corporations were formed; the first, the Big Lake Oil Company, with an organized capital of 400,000 shares of the par value of $10, which acquired the Pickrell leases in consideration of one-quarter of its shares, the return to the Pickrell group of the moneys they had expended upon the property (about $200,000) and the assumption of their lease obligations to complete the two wells started and to drill four additional wells (under a plan which centered full liability in the Benedum group) at an estimated cost of about $250,000, making total obligations about $450,000, the remaining three-quarters of the stock to be held by the Benedum group. The second corporation, the Plymouth Oil Company, one of the defendants in this suit, acquired the remaining three-quarters of the shares of the first corporation and against them, as capital assets, issued 1,200,000 shares of its own stock of which 150,000 were preferred, convertible into common, and the remainder, 1,050,000, were common. Shares of both classes had a par value of $5.

The Benedum group, spoken of throughout the litigation as the promoters, of which Farquhar, the intervener in this suit, was one, proceeded to finance the undertaking in the by no means novel way of selling preferred stock of the Plymouth Company at $3 per share with one share of common as bonus, donated by the promoters for the purpose. Farquhar (charging no commissions) sold

the shares mainly to his friends, among whom were William M. Henderson, the plaintiff in this suit, F. B. Lockhart, A. R. Budd, and W. J. Wilson. To these gentlemen, covering the period from November, 1923, until June, 1924—new wells coming in all the time—he sold shares varying in amounts and prices (stated in round numbers) from 6300 to Wilson (who bought the smallest number) at $1.50 a share (reckoning the bonus shares) to 64,000 to Henderson (who bought the largest number) at $1.35 a share. In addition, Farquhar gave Henderson 5,000 shares of his own on Henderson's insistence that he be permitted to share in the promotion stock, and to the first three he gave 2,772 shares of his own to adjust a misunderstanding on their part that Plymouth owned all instead of three-quarters of the stock of Big Lake. The shares were then selling at $10. It may be well here to state the value of these shares, not to make an alluring background but to show what probably moved Henderson and his associates to conduct in June, 1925, on which this case turns.

In a suit which Henderson and others instituted against the Plymouth Oil Company in the Court of Chancery of Delaware (supra) for the cancellation of 700,000 shares of the common stock of that corporation held by the Benedum group as promotion shares, that court decided the property of the corporation against which it issued its stock was worth the par value of its shares. Indeed, the Big Lake property in question was appraised by reputable and competent appraisers to be worth nearly $80,000,000, and on that estimate the stock of the Plymouth Oil Company was worth about $76 a share. The market price quickly rose to $57 a share. Of course everyone converted his preferred stock into common with the result that, reckoned on their shares purchased at figures ranging from $1.50 to $1.35 a share and salable at the market price, Wilson, the purchaser of the smallest number, had a paper profit of $341,000 and Henderson, the purchaser of the largest number, had a paper profit of $3,573,000; the other two had profits for amounts intermediate these, and all had profits close to or in excess of these sums which at current market prices they could, had they chose, immediately turn into money.

This was the situation before the controversy broke out at a stockholders' meeting of the Plymouth Company on June 23, 1925. There Henderson discovered that its outstanding common stock was 1,050,000

shares. He immediately charged Farquhar with having falsely represented to him and his associates that the outstanding capital of the company could never exceed 350,000 shares—150,000 convertible preferred and 200,000 common. Farquhar flatly disputed this assertion. I pause to observe that the true situation as to capitalizing and financing the Big Lake and Plymouth companies was readily available to anyone interested and was generally known to other purchasers of the stock. Moreover Henderson and his associates knew the amount of preferred stock issued (150,000) and they knew a bonus of one share of common was given with each share of preferred purchased (150,000 shares), for they had acquired their shares on that plan, leaving, on their understanding, only 50,000 shares of promotion stock for the Benedum group which was developing the property and had assumed the Pickrell liabilities of $450,000. The very improbability of such a thing in the light of modern financing should, I think, have put the Henderson group of business men on inquiry. However, Henderson and his associates have testified that in making their purchases they relied on Farquhar's representations and the trial court, on a sharply controverted issue of fact, has found that these representations were made by Farquhar and were false. It is quite unnecessary on this appeal of a case in equity to recite and review the testimony on that issue, for these findings by the trial court on an issue peculiarly within its province, made on evidence sufficient to sustain them are, in the absence of plain and manifest error, conclusive upon this appellate court. Keeton v. Jefferson Standard Life Ins. Co., 5 F.(2d) 183, 186 (C. C. A. 4th); Hazelwood Brewing Co. v. United States, 3 F.(2d) 721, 722 (C. C. A. 3d).

On these facts, as later found, Henderson and his associates had a valid grievance and this is true wholly without regard to the wealth Farquhar had brought to them. But injuria non excusat injuriam. Conceiving they had been defrauded of a share of the amazing value of the Texas property represented by the difference between what their holdings bore to 350,000 shares and what they bore to 1,050,000 shares, they immediately set about to recover it. They estimated this difference at 250,000 shares of the Plymouth Company. They knew Farquhar had 50,000 shares, then worth about $2,000,000, and demanded them of him and also demanded that he procure from the Benedum group, on an intimation of crim-

inal proceedings against them, the remaining 200,000 shares, then worth about $10,000,-000. The members of that group had nothing to do with Farquhar's sales and representations. For reasons easy to imagine the Benedum group refused to yield up their stock. However, Henderson and his associates still demanded that Farquhar give them his 50,000 shares and that he get the remaining 200,000 somehow. These demands were not preliminary to civil proceedings but were made upon Farquhar at several meetings where Henderson and his associates were guided by counsel, with a constable sitting in another room with a warrant (one of two they had previously sworn out) for Farquhar's arrest in his pocket. I shall not, for reasons presently shown, discuss these interviews beyond saying that one of Henderson's associates present revealed their character by admitting that he and Henderson and the others intended to use the warrant if Farquhar failed to "come across" with the stock. (R. 343.) He came across—part way—by indorsing his certificates for 50,000 shares—all the property he had in the world—and handing them to Wilson. But, even then, Henderson and his associates refused to assure him that by this act he would be saved from prison. Henderson and his associates maintain that, though intending to employ criminal process against Farquhar and having him surrounded by all the machinery of duress, they did not close it in on him, but on the contrary Farquhar, in complete ignorance of all that was happening, was moved by his conscience and signed and delivered the certificates of his own free will.

What followed is pertinent on the issue of duress as bearing on what was done and showing what thereby was intended. When Farquhar failed to procure and surrender the remaining 200,000 shares, Henderson and his associates had him arrested on a criminal charge, held in excessive bail which later was reduced, prevailed upon the district attorney to send a bill of indictment to the grand jury which was promptly ignored, and thereafter sought political influence to coerce the district attorney to send another bill of indictment to another grand jury, which the district attorney refused to do.

As I stated at the beginning, this is not a case where Farquhar is on trial for his wrongdoing; it is a case of duress on the part of Henderson. The issue is one of fact and a narrow one, and this issue, reduced to precise terms, is: Confessedly having at hand all the machinery of duress, did Henderson and his associates use it, or, using it, did Farquhar know it and yield to it?

On this issue I would find that Farquhar parted with his shares under duress imposed upon him by Henderson and his associates. For my grounds I refer and subscribe to all findings of fact and the entire reasoning of the Honorable W. H. S. Thomson, the learned trial judge, as they appear in his opinion reported in (D. C.) 13 F.(2d) 932.